United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. Thank you. Good afternoon. The first case for today is 2019-60896, Huawei Technologies, Inc., Technologies USA, Inc. and Huawei Technologies Company Limited versus the Federal Communications Commission. Mr. Carvin, you may proceed. Good morning. Good afternoon, Your Honors. Michael Carvin for Huawei. Although the FCC concededly has no national security expertise and is concededly independent of the president who has plenary power over national security and foreign affairs, it nonetheless argues that it's authorized to make a very sensitive foreign policy national security decision, that is, to deny universal service funds to a company because of its place of origin and because the FCC thinks that those ties create a national security threat. Mr. Carvin, good afternoon. There's a lot of complicated issues in this case, and I just want to make sure we have the right framework for the arguments you're proposing to us, so if my It seems to me we have separate challenges to the rule and to the initial designation. Am I right about that at the outset? Yes. Okay. So there are threshold issues that go to each one of those. You may think they're overlapping. There are issues like ripeness, finality of agency action, and the like. If we get over those threshold issues, then we have a challenge by you to the right. They have no authority at all under the statutory framework. If we get over that, then we have an APA and a constitutional challenge to the substance of the rule. Am I right so far? A hundred percent. Yes, sir. And then if we get to the initial designation, we get over the threshold issues, then we're looking at whether the initial designation is unlawful or unconstitutional. That is correct as well. I need the big picture. Okay. Let me just ask you this real quick. General procedural issues here. We have a final rule that's somewhere around November 2019. As I understand it, the initial designation is sort of part of the final rule. It's done in the final rule, concomitant with the final rule. Is that correct? Yes, sir. They jammed an adjudication, an adjudicatory decision that Huawei was guilty of the rule that had previously not existed into what it purported to be a notice of proposed rulemaking. They had separate orders on both of those. Okay. Final question is there has been a final designation of Huawei and ZTE. Am I right about that? By the Bureau. By the Bureau. Is that appeal to the full commission? Is that correct? That is also correct. And they need to decide that discretionary appeal by November 27th. Okay. All right. I appreciate it. Please continue with your argument. I just want to make sure. I have a question about that. Why won't this be for effective purposes moot? Once they just make their actual decision on 7th. Why will we be reviewing this part of it if there'll be a whole new record when they, you know, they may win. You may win or you may lose, but there'll be a whole new record created as part of the appeal of that. And there was some talk in the 28 days about consolidating or bringing that to us. How do we know they can come to us? Right. No, your honor. The reason that none of that will moot out any of our challenges is because our challenge is not to the ultimate denial of the USF funds. Our challenge is to the process by which they've gotten there. And there's only three cases you need to know about to know that that is right and needs to be decided today. Okay. What happens with the second? Part of it in November, November 27th comes around. Let's say you're successful. What happens? Oh, if we're successful and they, and they, in the extraordinarily unlikely event, decide that they were completely wrong, then presumably there may be some mootness issues. Although we have suffered some harm, but they can't hypothesize a contingent hypothetical down the road, which we all know is never going to happen to stop this court from exercising its virtually unflagging obligation to decide the right controversy that is before it today. And that right controversy is the administrative process, which is going to lead to the disqualification of funds. And under, for example, Texas versus us, your decision in the fifth circuit, the government was making exactly the same argument it's making now, which is just wait until the end of the process and see if there's a gaming license issued to the Indian tribe that Texas doesn't like. But judge Jones said, no, you misunderstand the objection. The objection is to the invalid administrative process, wholly apart from the final decision. And that of course is exactly what we're arguing. We don't think they have the statutory authority to do it. And we think the process denies us our basic rights under the due process clause in the APA. To the extent you're challenging the rule itself in this initial stage, would that be considered a facial challenge, though, that would be subject to the Salerno standard? I don't know what that would mean in these circumstances, but yes, it's a facial challenge that the FCC has no authority to make the kinds of foreign policy judgments that are embodied in the rule in the national security thing. Well, it would have to be unlawful in all of its applications. Well, it would have to be a facial challenge. Isn't that correct? It would have to be an exercise of authority that's beyond the statutory language. And the statutory language does not give them the ability to make judgments about foreign companies' ability to service us because of their place of origin. So that is facially wrong. Now, the problem is, of course, they haven't... Can I ask a question? Do you believe the FCC has the power to make decisions about network security? This has all been characterized in the context of national security, and that's the way that your opening sentence was pitched. I'm going to... I'm going to assume for argument's sake they could say something that's within their expertise, a network is not secure. It is not a quality service because it's not a secure service. Isn't that what they have in fact said? Because allegedly your client has put in back doors in its products that allow them to have certain access that could actually cause the infrastructure to be turned off or manipulated. And also there's an allegation that your client would eavesdrop on the privacy of consumers, and that's a public interest. Those are the types of... Those are the nitty gritty, I believe, of the allegations. I'm not saying those are true, but why aren't those completely legitimate concerns of the entity that's in charge of the infrastructure? Because they're not looking at the infrastructure. That's what we asked them to do. We asked them to look at our equipment and services and they rejected that. That's what their Security Council Advisory Board said, please look at the processes and the equipment and see if there's a problem. They never made any... Haven't they done that by saying we have determined that your client does these things and it's too big of a risk in the infrastructure of the United States to have these two network security risks, both with the back door and with the eavesdropping? Right, but that had nothing to do with our equipment. They never suggested that our equipment was below par or met some standard which they never articulated. But that is your equipment. If your equipment has in it some back door, that is part of your equipment itself. It's the design of your product. Right, but it's our propensity to allow the Chinese government to access that back door, which was the entire rationale of their decision. Please read their decision. Paragraphs 6 through 17 and paragraph 38 through 53 are all about our ties to China and China's predisposition to engage in cybersecurity. It had nothing to do with our equipment, which they didn't even mention in the notice of proposed rulemaking. That was a pretextual tale. You're saying that there's no allegation that your equipment has a back door in it? That you don't have some kind of back door capability in the equipment itself and in the whatever programs would be run to use your equipment? To be precise, Finite State didn't say we had back doors. The UK board that they looked at didn't have any back doors and that would not provide access to China. They never reviewed those reports. They simply cited them after their Google search. But the point I want to make is that our finding of national security was principally, if not exclusively, based on our ties to China. That was the entire thrust of the NPRM and the notice of proposed rulemaking. And that's another reason that this is ripe for adjudication now. We are arguing that an independent agency not make those kinds of foreign policy judgments. That's right now, because just as it was ripe in CFPB, seal your law when they initiated the process through unconstitutional officers. I understand the court has granted en banc review in the Cochran case to deal with actors exceeding their separation of powers. Now, it's quite clear in the foreign policy area, there can be no such thing as an independent agency. Even the dissenting opinion in Celia law agreed with that. You can't have an independent State Department or Defense Department. They are making a very sensitive foreign policy decision. They say the current president agrees with them. Well, that's a happy coincidence, but it's irrelevant because the question under separation of power is who decides, not whether those with the power agree with those who don't have the power. Are they actually making a national security decision, though? Or are they making a decision that there is a risk to the network and to the public welfare because of privacy and the potential for a backdoor, no matter whether it's China or Joe down the street who can access the backdoor? Absolutely not, Your Honor. You cannot read their order and think that if Huawei was based in Canada or Mexico, they would have deemed us a national security threat. The entire analysis is that we have close ties to a country that they say is a cyber security threat. It has nothing to do with our services. It has nothing to do with our equipment. It has everything to do with our ties to China. That is a quintessential backdoors, doesn't it? I don't know that the ability for backdoors, your equipment has that. Isn't that established for the purpose of this record? I don't think it's established in this record. Nothing's established in this record because they never gave us any notice of this equipment issue until the draft order. Whether or not there's a hypothetical backdoor, I suppose you could say that about any security system. You could always hypothesize a backdoor. Do they have any evidence that there's ever been a backdoor that any Chinese agency or us has ever used? The answer is unqualifiably no. This is a lot of speculation based on the fact that we have ties to China, and that's what creates this national security threat. That is a foreign policy decision. That is not a technology decision about equipment. That is something that the FCC can't make. Excuse me for a second. That's a distinction I want to make. It would seem to me that it That's one thing, but I'm reading from the rule here, paragraph 41, which says, in formulating its initial and final designation, the commission will use all available evidence to determine whether an entity poses a national security threat full stop. Then it lists a number of evidence that they might consider, but it's totally up to the commission to make this national security determination. If this were a technology-focused rule, I would have expected the rule to read very, very differently. Instead, it reads like a national security rule. It is a national security rule. Unfortunately, we don't know what they mean by national security since they never defined it or articulated any neutral standards. The only flesh they've ever national security because they have unfettered discretion. When I first read about this case, I was alarmed that you were asking a court to reconsider an agency's national security determinations. Then I read the statute. I expected the statute to address this issue quite explicitly. I do not see national security in the statute, except the most general terms. What I'd like you to address is, what is the impact of an actual statute that has been passed by Congress, the Secure Networks Act, on the commission's exercise of authority here? I'm flabbergasted by that because, usually, in these admin law cases, I think, why doesn't Congress pass a law? Congress has passed a law. Speak to that. Your Honor, the system has worked here. Congress has passed a law on the use of USF funds for national security. It shows that the rule is invalid for four reasons. First and most obviously, the commission is correct. They said Huawei's equipment was no good because of the 2019 NDAA, but they made it clear that that's only certain kind of equipment, equipment that can redirect or route or visit data. It doesn't apply to antennas or batteries or cables, which are entirely incapable of accessing data. The most overbroad part of the FCC's rule was saying you can't buy batteries from Huawei, which can't possibly pose a national security threat. The SNA makes it quite clear that that's grossly overbroad. It also eliminates, if one was tempted to bend the rule of law or separation of powers because they think Huawei is a national security threat, that's eviscerated because we can't possibly be a national security threat, even if you believe every defamatory thing that the FCC says about it. The second thing that makes it clear it's wrong is it focused on the equipment, as you point out. The SNA focuses on equipment, not companies. Number three, it leaves all of these national security determinations not to the independent FCC, which has no expertise, but to national security agencies in the executive branch who do do it. Finally, under Brown and Williamson, you have a very specific subsequent statute which tells you how to deal with the problem, which eliminates any argument that this vague general statute, which the FCC is latching onto to inject itself into the foreign policy sphere, allows them to do it because the SNA has made it that they can't rule companies out of bounds, they can't rule batteries and antennas out of bounds, and they are not qualified to make that decision. I see I'm out of time, unless you want to say. I think each side should get two more minutes because I have several questions we haven't gotten to yet. First one is about this Secure Networks Act, which says any agency with a national security interest, given that Congress said that the FCC was created for national security interest, how do we know that the FCC lacks national security expertise? These are the infrastructure stuff, not national security about how to do the Navy, or how to do, but national security expertise about infrastructure of the United States. Well, because the statute goes on a list, the agencies they're talking about, if you look at 1601C or 16082, the only thing the FCC does in this process is make a list that the other agencies tell them this creates a national security risk. So they're simply scriveners listening to these people who actually have the relevant expertise. The FCC has expertise in communications. What it doesn't have expertise in is which countries cause foreign policy threats. That is left to the president. If the next president or this president decides that it's quite okay to have USF funds go to Huawei's batteries, he cannot order the FCC to abide by that common sense distinction since they are independent of his directives. And that is why having this independent agency free of the president make these sensitive national security decisions is not only wholly unsupported by the statutory language, the statutory language can't be stretched to this area because it would create at least a direct threat of an unconstitutional delegation to an independent agency. Can you address what the harm is? It's my understanding that you could still be on the list during the time that this initial thing was under review. Is that correct? That you weren't banned during the time this was all under review, correct? That is correct. So if you weren't banned while you were under review, what harm, actual harm, did you suffer during this time period as opposed to a future time period when you actually are banned? And I mean you, your client. Right. Two things. One is the record is replete with people who have canceled contracts, suspended payments, and stopped doing business with us because of the initial designation. In the initial, so-called initial designation, the commission itself said it was confident that we were a great security risk. That's in paragraph 45 and 54 of the order. They've made that determination. The only thing the so-called final designation is, is whether or not they're going to reconsider that. So it's a final determination. We have suffered the same harm that this court has found in, for example, the stigma plus due process cases. We've lost goodwill, we've lost business, which in Marrero and Texas v Thompson created enough of a impingement on our due process liberty interest to make it justiciable. Surely a for t or i, it's enough of a harm to make it justiciable now, rather than it waiting for the inevitable shoe to drop when the commission says, no, we weren't wrong the first time. We still think and are confident that they're a great security risk. So we're suffering current harm. We're challenging. I want to emphasize this yet again, your honor, the process, the process is being done by unconstitutional officers. So it's right now. Next question, actually, what process were you do? I don't think you're saying you've lost constitutional due process. Maybe you are. What process are you saying you didn't get that you should have had because you did, you were allowed to present materials. Did you were allowed to lie to, to, to suggest to them that they were wrong about your client? Only after we were arguing, we were entitled to pre deprivation process. The deprivation was the initial designation for the reason I just said, it cost us harm. It cost us, they stipulate to the stigma plus the same harm that was in Marrero and Texas V Thompson, which is Eldridge here or something, or what is your pre deprivation? You don't believe you have a constitutional right to pre deprivation remedy for, um, for getting a subsidy. Do you do process? What gives you due process here? Is it the regulation itself or? Yes. First of all, the APA gives us due process. It says you get notice in common and the, and the final rule needs to be a logical outgrowth of what you commented on. Now, what did the NPRM said? Please look at paragraphs 19 through 21. It said, we're going to try and figure out what rules to come up with to figure this out. It never gave a hint that they were going to adjudicate Huawei under a rule that didn't yet exist. They never gave a hint that they were going to decide this for themselves. So we had literally no notes or any opportunity to respond to the factors, which they only announced in the draft order, unbeknownst to us, rendered us a national security threat. You won't see the words equipment or Chinese subsidies. You believe it's the APA that gives you the right to due process and that we were allowed to do notice and comment. And that's what you were deprived of. Is that the question? The APA is certainly a sufficient basis and you need not reach the additional point, but we do think it's relevant that also, of course, when a decision by a federal government final or not, and this is final in every sense of the word, but terminology causes you immediate harm beyond your reputation, financial harm, then a liberty interest under Romero and Texas v. Thompson has been violated and you are entitled to process before that happens. But I agree with you, your honor. Answer my question. Thank you. Uh, did my colleagues have any further questions? Because otherwise we'll hear from Mr. Johnson now. Okay. Thank you. Thank you, Mr. Johnson. You may proceed with your argument and I've given you two additional minutes, but I think we probably took four or five extra minutes. So, um, if you believe that you're not getting enough time, you can let the court know. Thank you. I appreciate that judge Alrod. Thank you. Uh, and may it please the court, uh, Tom Johnson appearing for the United States and the federal communications commission, your honor in adopting the rule at issue, the commission recognized that had it, that it had a limited, but important role to play in the national security space. And that is by preventing federal dollars funded by consumers from flowing to equipment manufacturers, whose equipment posed a threat to network integrity or to our communication supply chain, Mr. Johnson. So if, if I closed my eyes and I didn't know what rule we were thinking about, I would have thought you were talking about the secure networks act, because that you, that is almost exactly what the secure net networks act is, is enacted to address and Congress passed that rule. Congress passed that law and it's specifically circumscribes the, the authority of the commission, uh, to make national security judgment. In fact, on my reading, it, it turns, it turns the FCC into what, you know, what Mr. Carvin called a scrivener. I would say it's sort of a record keeper for national security determinations. And so here's what I don't understand. I hear what you're saying that the FCC has to have some kind of competence to deal with, you know, what Judge Elrod is talking about backdoors in, in communications, uh, services and equipment and that sort of thing. But when I look at the statutory bases that the FCC thinks gives it a bad authority, I see just a bunch of fog, frankly, just a bunch of vague words. And then I look over at the secure networks act and it specifically addresses this. So why isn't this a classic Brown and Williamson case where Congress has specifically legislated something, uh, that circumscribes the, the, the authority of the agency such that the rule that you've adopted is just way beyond that. So, uh, so Judge Duncan, so first in terms of the posture in which this is coming to this court, um, Huawei first raises this argument about the secure brief. And so there hasn't been full briefing on that act. And I think a waiver principle is particularly appropriate here because the commission has subsequently, uh, issued a declaratory ruling in July of 2020 that, uh, provides the commission's authoritative interpretation of the secure networks act. Huawei has not, uh, to my knowledge, petitioned for review of that. That record is not currently before this court. Well, I'm not suggesting that we're reviewing the secure networks act. I'm saying the secure networks act reflects on the utter lack of authority that the FCC has to adopt the final rule that we are reviewing. So let me address the substance, your honor. So, uh, the secured networks act contains a provision, a savings clause section three B of that act that says that to the extent I'm paraphrasing here, but I, I have the language. Um, actually if the commission has before March 12th, take an action that in whole or in part implement subsection a, the commission's not required to revisit such action, but only to the extent such action is consistent with this section. So it's a bit of an unusual clause that refers to the commission having already taken action to implement this statute. And the only thing that Congress could possibly have had in mind here was the commission's November, 2019 secure supply chain order. And so as we set forth in the July, 2020 declaratory ruling, I was discussing, we believe that Congress here was trying to build upon the commission's preexisting authority and to create a process to formalize a process through which executive branch agencies can present to the commission, their national security determinations with respect to, uh, to potentially harmful equipment. Well, hold on, let me see if I understand the secure secure networks acts was enacted by uh, well, let me put it this way. The rule that we are reviewing specifically gives the commission as I, as I read it, specifically paragraph 41 specifically gives the commission the independent authority to make a national security threat determination with respect to companies. I mean, would you agree with that? I mean, that's what I, that's how I read it. I do think it gives the commission the authority to make a national security judgment. I think that's a target. I'm sorry, your honor. Did you know that's okay. But, but in light of that, the secure networks acts bounds and limits the discretion of the commission. It says in 1601 B one, um, uh, the, the, sorry, uh, 1601 C the commission shall place on the list any communications equipment or service that poses an unacceptable risk of the national United States based solely on one or more of the following determinations. And we're, we're given a four sort of bases for making that determination. Are you saying, I mean, that seems to me to be completely inconsistent with the rule, which is based on the commission's own views about national security. How can I reconcile those two things? Well, your honor, I think that, um, there's actually in terms of the way in which covered equipment can get onto the list and the secure networks act, there is a two-step process. It has to be brought to the commission through one of those four mechanisms. And then the commission can identify the equipment. And there are several findings with respect to the equipment, the commission must make one of those being whether it's otherwise, uh, otherwise presents a national security risk. But I think that the interplay of this rule with what the commission has already done is something that is coming to this court again, on reply. And it's something that the commission has now both issued an authoritative interpretation on and sought further notice about how to best implement this. And with respect to Huawei specifically, your honor, I mean, they, they don't have much reason to complain about the secure networks act because one of the ways in which an, an, a, a designation can occur under that act is if the company is listed by Congress on the authorization statute, the NDAA, I mean, that is the same way in which the commission under the 20, November, 2019 order, um, uh, initially designated Huawei, or at least in part relied upon that congressional judgment. So I think, I don't think at least in this case, there's any inconsistency between what the secure And there's also in terms of timing here, your honor, there's at least one funding year that is proceeding under the commission's current rule prior to when the secure networks act was passed. And when we're going through this further rulemaking, so especially when Congress includes that savings clause, I don't think that that invalidates the commission's prior action. And I'm happy to turn to talk about why I think the commission had that authority, because I know you had some questions. Well, I thought, see, I, okay, that's all very interesting. I thought what we were reviewing here, at least one of the issues in my, to my mind, the major issue, which is whether the commission had the statutory authority under the, you know, under, under the statute that gives it, purports to give it the authority to adopt this rule that gives it sole discretion to make a national security threat judgment with respect to a company. I thought that that, that was, I think it is an argument that is before us. My point about the secure networks act is the same point that the Supreme Court made in Brown and Williamson with respect to more specific legislation. It demonstrated that the rule that the agency had adopted was ultra virus. So that's what I'd like an answer to. Why doesn't the secure So your honor, the reason that the commission provided in its declaratory ruling was that the key version, the key language and the key distinction between this and the, and the cases that you're talking about is that savings clause. And the question is, what does it mean to be consistent with that section? What the commission determined in this declaratory ruling is that it did not believe that consistency that there was an inconsistency between the, for the commission to have two avenues here to go with. It's pre-existing rule under the November, 2019 order and the secure networks act. Now, again, the reasoning there and further questions that are being asked about how to, how to implement that precisely. That's part of an ongoing administrative process that, you know, Huawei to my knowledge is not challenged. And it's, I again, think it's, it's for all the reasons that you're discussing, it's complicated enough that I, I think that the, that the court should deem it waived for current purposes. I don't understand the waiver. I just flat out don't understand it. It is a legal point about whether a subsequent act by Congress demonstrates that the agency lacked authority. It's not something you can wait. I just don't get that. Well, your honor, again, again, on the merits, I mean, I do think that what makes this different is the existence of that savings clause in which Congress explicitly contemplated the fact that the commission had just taken action in this very space. Savings clause of 1602B, is that right? Of the secure networks act, section three, secure. Yeah, I have it as 3B, right? That's probably, yeah. Mr. Johnson, is it, I'm trying to make sure I understand this. You haven't addressed this in your briefing because this was raised in the reply brief, this, this argument, is that correct? That's correct, your honor. Okay. And you're addressing it now to us. The position is that, that the, that the Congress's action is not inconsistent, but, but is actually blessing and aware of what was already done and intended to scoop it into that, so to speak. That's correct, your honor. It's complementary. It formalized a process. It also, you know, took cognizance of the fact that we had proposed as part of our earlier order, providing compensation to companies that had to rip and replace equipment as a result of a desire to move to more secure equipment. Okay. Well, we may need briefing on this or something, if this is going to be a seminal issue, but, but I, and I don't know that at this point. But I guess the basic question you come back to, if it wasn't because of the Secure Networks Act, what did give the commission the power to promulgate the rule to begin with? So the commission... In the air, so to speak. Right. So the commission relied upon several, several provisions of section 254 of the broad discretion to balance competing policies under the act. The first, as I think your honor mentioned, was the very first universal service principle, which is titled quality and rates. It's that quality services should be available. And the commission reasonably concluded that a service that is not secure is not a quality service. If I understand that, if we're at Chevron step one, you want the court to write that when Congress legislated quality services should be available at just reasonable and affordable rates in section 254, Congress was implicitly delegating to the FCC the authority to make national security determinations like the ones it makes in the rule. That's what you want the court to write? Your honor, I think that, that it does give the commission the authority to look at national security in a very targeted way. I mean, the approach that Huawei would have this court adopt is one in which no actor within the executive branch, not the president, not the commission, could look at network integrity if the threat to network integrity came from some foreign source. It would essentially tie the hands of the federal government to fund national security threats. No, it doesn't. Congress could pass a law directing exactly that kind of determination to be made, and it did. Well, but your honor, I think at least putting, putting aside the Secure Networks Act that we've, we've gone back and forth on, I do think it, you know, the touchstone, you're correct, is congressional intent. And I think that this court's decisions in Alenco and Texas PUC provide a roadmap for how the court ought to interpret the statute. I mean, in those cases, the commission used its universal service authority in order to further both the universal service goals as well as a separate goal of local competition, even though local competition was not specifically mentioned in section 254. And in fact, Congress had given the commission other tools to deal with that in sections 251 to to account all of its public policy, all of the public policy reasons underlying the Communications Act. And that has a textual basis, your honor. That is in, that is in 254C1D. The commission is able to adopt a, an evolving level of universal service consistent with the public interest, convenience, and necessity. And Huawei, in its brief, it points to Supreme Court cases that say that in interpreting a public interest mandate, the agency should take its bearings from the purpose of the statute. That's what we did here. As you noted, Judge Duncan, yes, it's there, it's general language, but in interpreting what the public interest means, the commission can permissibly look at section 151, which talks about provision for the national defense and protection of life and safety. And again, in Texas PUC in Elanco, this court looked at section 157, the purposes, which, which included deployment of advanced telecommunication services, the competition purpose in section 151. And it's, it's the same provision at issue here. And the court said that the commission could permissibly balance those statutes under the broad delegation in section 254. And I do want to touch upon the constitutional issue, which, which has come up as well. I think that this court, first of all, could reject that argument because it makes no sense on its face. Ordinarily, when a party invokes a constitutional avoidance canon, it suggests an interpretation that would cure the constitutional problem. Here, Huawei has suggested an interpretation that would compound that problem. Huawei's interpretation would mean that national security, to the extent it bore on network integrity, would simply be out of bounds for either the commission or the president to consider. Whereas what the commission has put in place for the past 20 years has been a process whereby the president and other responsible executive branch agencies can provide national security judgments and recommendations to the commission, which the commission has always provided significant weight. So I, so I, I have read the rule and I see the examples that you're, that the rule is pointing to. And what those examples seem to me to be where you have actors that actually have national security expertise, like the president, that, that the, the commission then takes into its decision-making process. It seems to me that what you had, and one, one example that you give in the rule is, sorry, it's a, it's a different law. It's, it's the law about spectrum auctions. The 2012 Spectrum Act, this is in paragraph 33 of the rule, which is given as an example of national security. That's where other agencies are telling the commission, here's what, here's the national security angle. It's, it strikes me that this is exactly the opposite, where the commission itself has been turned into sort of a miniature state department and is making its own national security determinations unfettered by any other actor. That seems to me to be very, very different. So, your honor, I don't think it's that different from, for example, our section 310 authority, which we discuss in our brief, in which if a, a particular carrier has a certain reportable level of foreign ownership, the commission can deny a request for a license if in the public interest. Well, in that case, who sets the threshold for the level of foreign ownership? Well, Congress sets the threshold for level of foreign ownership, your honor, but that doesn't resolve the public interest inquiry. The question then is whether it's a, is whether that level of national security is a threat. And so, in that context, we have formalized a process, and actually now it's been further formalized through executive order in which we take into account the submissions of responsible national security agencies to make that determination. And we have done the same here. I mean, I think that just makes my point, which is you take into account the determinations of the responsible national security organizations. Uh, that, that just strikes me as what we're doing here is the obverse. Well, respectfully, I disagree, your honor. Again, I mean, the, you know, Congress is, is, is, you know, Congress is able to provide or delegate to independent agencies the responsibility to make certain judgments. With respect to the constitutional standard here, uh, the, the president, uh, the, the test is, as stated in, in Huawei's brief, Morrison v. Olson is the president impeded in his duties. And here the president has all of the tools that he ordinarily would have with respect to traditional independent agencies. Uh, you know, SELA law doesn't, doesn't change that, uh, judgment with respect to the FCC. Plus, uh, there is this established process in which, uh, the commission, uh, provides to executive branch agencies, and here through notice and comment, the ability to weigh in on this specific rule. And I think, you know, and I, I think here it's important to sort of separate out the rule that's before the court and the initial designation, because all that the rule before the court says is that the commission is not going to use universal service funds to fund a national security threat. It's difficult to. That's a good segue into, into my question. I guess one thing I'm struggling with, assume that you can assume that the agency has the power under the statutes to make the rule that they did. Where is, where is the intelligible standard for these designations articulated in the rule? How does a company know whether they fall within the rule, the ambit of the rule or without it? Uh, so your honor, um, the, um, the, the standard is as articulated in the rule, which is, um, which is, uh, poses a threat to the national security of the, of the nation's communications networks and supply chain. And while that's admittedly a general standard under this court's case law in Rourke v. Hardy, as well as under the DC circuit's case law and center for urological interests, uh, the commission is permitted to employ a general standard and then provide further guidance, both through the preamble of the rule and through case by case adjudication. Now, Huawei doesn't disagree as I read their reply on this, on this general standard. They simply think we didn't provide sufficient, uh, meat on the bones, uh, if you will, to the, to the standard in the rule, but it's very clear as we've been talking today that what the commission was setting forth was essentially two principal buckets of considerations. First, and this is where the other executive agencies come in, um, is a, is a foreign country using a company in order to, uh, conduct cyber espionage within the United States? And then the second point, which goes to something Judge Elrod has asked about a couple of times, um, it's whether you actually see security vulnerabilities in the equipment. And these are both points that we raised citing authorities in the initial designation of Huawei. Now, my friend on the other side has pointed out a couple of times, uh, that he feels that he didn't have sufficient notice of what was in that initial design. But, um, that is because, uh, you know, that initial designation is in fact the initiation of a process. There was some talk about the way in which the commission proceeded here, but there's nothing improper about it. What the commission did was it completed a rule making that set up a general process, a process that would play out through case by case adjudication. And then at the same time, the commission initiated an adjudicatory proceeding as to Huawei. And so the initial designation was in fact the notice of the specific grounds on which the commission, uh, believed, uh, that, uh, Huawei, uh, potentially posed a national security risk. And so Huawei can't claim that it lacked notice as respect to the specific allegations as to it. How did the agency identify Huawei as opposed to Samsung or Nokia or any other company out there for the first initial designation? Well, your honor, the commission noted that the record that it had before it was unique as to both Huawei and ZTE. It included, for example, the sworn testimony of six intelligence chiefs before Congress, uh, excuse me, that Huawei potentially, uh, you know, posed a national security threat. The review by the commission of a submission by the Department of Justice in this case, which, um, laid out reasons to believe that Huawei, uh, posed a national security threat, as well as the commission's review of, uh, evidence that, that showed that Huawei's, um, equipment had security vulnerabilities. That include both the report that I believe Mr. Carvin, uh, alluded to of the United Kingdom's oversight board, which, which, um, which, uh, showed that year after year Huawei was not taking sufficient, uh, sufficient account of potential problems with its equipment and complying with mitigation measures. And so, all that the, all that the, and, and as well as, um, what was the finite state report, which was, um, specific firmware of equipment, uh, of, of Huawei equipment that had security vulnerabilities. And again, all the commission was doing at this stage was putting Huawei on notice. That's why the commission submission here is that that is not even final agency action. Um, that is then, and at minimum putting the ripeness argument aside for, for the second, uh, the court ought to wait until the, any final designation proceeding, assuming that the commission affirms the Bureau's final designation, uh, to reach, uh, these issues. But Judge Wilson, I, I think. What do you want us to do? I mean, will we even have jurisdiction over that? Uh, you want us to wait and look at it all in one fell swoop and we, and we don't, that might not come to us. Well, I do think that's all within, within Huawei's litigation judgment. If a, if a final, if a final, uh, uh, uh, designation, uh, comes to be. And so I agree, Judge Elrod, as we, as we recommended in our papers, we think that dismissal would be the appropriate, uh, outcome. And again, we've got two arguments here, ripeness. The Fifth Circuit, isn't that right? Of course, they, they would have a, a choice of venue. But Judge Wilson, oh, I'm sorry. If we end up with differences of opinion between the circuits on this particular rule, then initially there's, you know, we don't believe that just assume argument, know that there was a basis. And then after all the basis is proven up, then know, well, there really is a basis. I'm just hypothetical question asking. I think it certainly could lead to inconsistent determinations, Your Honor. Okay. Can you please address the argument that they have suffered an actual, actual harm because of loss of contracts? Yes, Your Honor. So in, in the cases that, that Mr. Carvin, uh, points to Thompson, and I think Haleah is the other one. I mean, those were instances in which either a company alleged that it had lost its entire business opportunity or else that, um, that, uh, that there was some protectable interest under state law of which there was a, a, a total deprivation. Here, uh, there, there are no such allegations. Uh, the, this court's case law makes clear that a mere, um, injury to reputation is insufficient. But apart from this question of stigma plus, I think a much easier route to the exit on this issue is this court's opinion in Monk v. Houston. In Monk, the, the, this court made clear that a, a legally cognizable, uh, deprivation does not occur by virtue of initial process. In other words, you can't argue that your due process, that your due, uh, additional notice when you receive the initial notice. Otherwise, um, there'd be this sort of infinite regress of notices. I mean, their only response to that is that we think we ought to have reached out to them with a private letter. They provide no reason why that ought to be considered a constitutional rule. Certainly when the government, uh, in, serves a subpoena, an initial civil complaint, an indictment, there's no constitutional reason why that needs to be preceded by, by private notice. And so I think for how do you distinguish on the Texas case on the ripeness? As I recall, your honor, that was a case in which this court, uh, uh, said that the statute itself provided a process that the commission had failed to follow. I believe we, we, uh, make that same argument in a footnote distinguishing that case. Um, and so we think it's distinguishable on that basis. Why do you put in the footnote arguments that are front and center on the other side's brief? Well, I think we, I mean, it might've been a question. That's not a, that's not an actual question, sir. Unless my colleagues have questions, I think you need to wrap it up. I just want to revisit one thing and I don't mean to drag this out, but I just want to make sure I 3B. I'm reading it. You are saying that the final rule that we're reviewing here falls within the ambit of 3B. In other words, if the commission has before March 12th, 2020 taken action, then in whole or in part implement subsection a, which has to do with subsidies, the commission is not required to revisit such action, but only to the extent such action is consistent with this that's, that's the savings clause, right? That's correct. And it includes within its ambit the rule that we are reviewing here. That's correct. Your honor. Okay. What, what legal effect does that have with respect to the challenge to the rule? Because we, we have before us a challenge under the, under the APA to this rule. And now you're pointing to this savings clause. What is the effect of that savings clause on the challenge to the rule? I just want to understand your argument. I think that the savings clause saves the rule. I mean, that is the commission's determination and its interpretation of that language in its July 2020 declaratory ruling. And I mean, again, I, I just one more note on the posture of that. I mean, obviously if, you know, if, if that provision or any part of the SNA is ambiguous, I mean, the commission would receive deference as to its interpretation and there could potentially be going to judge Elrod's point about consistency, you know, a, a, a brand X problem. If someone were to attempt to challenge the secured networks act, I mean, that, that court would then have before it the entire record underlying the secured networks act. So I just think that's another reason, you know, for the court to, to hold its fire on that in that case. But again, I think that we don't have that case in front of us. We have a challenge to the final rule. And I'm just struggling with what possible impact on that challenge, a subsequent enactment by Congress of a different law. I just, I just don't understand what impact that would have on a challenge to the final rule. Does it mood it? Does it validate the challenge? Does it, I don't, I don't know what it does. Well, your honor, you know, as I said, I mean, the court wants to reach the merits of that, the commission's position is that the savings clause both explicitly contemplates that prior rulemaking and you know, and, and, and builds upon it. It does not, it does not abrogate it. It's almost as if you're saying, and I don't want to put words in your mouth, but it sounds like what you're saying is that Congress looked at what the FCC did in the final rule that we're reviewing and tried to retroactively bless it through legislation. That's correct. I think it's a kind of ratification as could, could, as you know, often happens when, when the agency adopts a rule, Congress sometimes thinks that's a good idea. Let's, let's build upon it. Let's you know, let's provide a framework for it because again, part of what the SNA was trying to accomplish was to ensure that these rural carriers got compensation if they were placed on the list contemplated by that act. Thank you. I think that we've exhausted the subject matter and we have time for a rebuttal by Mr. Carvin. Thank you, your honor. You're on mute. Hold on. Can't hear you. Can you hear me now? Yes, we can. Thank you. I apologize. Let me begin with the discussion with the SNA that was just left off. First of all, the so-called ratification quite clearly says they won't revisit it, but only to the extent such action is consistent with this section. For the reasons that we've already belabored, it's wildly inconsistent with that section because it gets at equipment like batteries that can't possibly route or redirect information. And because it vests the national security determinations in national security agencies other than the FCC. So whatever this ratification argument is, it fails on its own terms. To the extent we've been accused of sort of sneaking this in at the last minute, I'd point out that the FCC referenced the SNA in its brief. It was passed only a week or two before we filed our initial brief. And we had, we've fully addressed it in the reply brief. And you can't waive an argument that's in further support of a lack of statutory authority argument in any event. As to Judge Elrod's questions about finality in Texas versus U.S., I think the distinction is there. They said that the agency was doing something inconsistent with statutory protections. Well, that's our argument. Quite inconsistent with the APA statutory protections, and it's quite inconsistent with the Constitution's statutory protections. So that's, that's a non-distinction. In terms of this notion that this initial designation aid didn't do any harm and is just initial, like a reason to believe, it's completely belied by what the commission said. The commission said that we think we are confident that Huawei was a great security risk. Then they sent it to their subordinates to say, do you disagree with us? If you do, you're fired. Not surprisingly, the subordinates saluted, sent it right back to the commission. And now the commission is reconsidering the same issue. There's no difference. That's not in the record, is it? That they're going to fire all the subordinates? This is just a rhetorical flourish on your part? It's fair enough, but they are employees at will, and they are clearly subordinates since they delegated it to them. But in all events, my only... That's not in the record that they pressured them. Oh, I'm not saying they pressured them. I'm just saying the subordinates could read the opinion. You said you're fired if you don't go our way. That seems like pressure. Well, that's right. And if they didn't give in to that pressure, it goes back to the commission. So what the commission did was issue a final designation and said, well, we might reconsider it. That is about as final as you can get. And it had precisely the harms, far more harms than in Texas for the United States, where there was no financial harm, no legal liability or anything of the like. So this is final. It should be done. As to Judge Wilson's questions on standards, I think it's very important. What's the standard for being a national security threat? You're a national security threat. It's a phrase. It's not a standard. And why didn't they do a standard? They claim the standards they invoked were in the adjudication of Huawei. All the standards were Huawei-specific. There was no general standard on equipment. It was just Huawei's is no good. There was no general standard on ties to a foreign country. It's just that Huawei didn't do it. Those are not neutral standards which you apply neutrally in adjudication. That is a preconceived gerrymander saying the only standards that matter are Huawei. Also, of course, since they are now claiming the standards only arise in the initial designation, that emphasizes, Your Honor, that you cannot disentangle the rule and the initial designation. They're pointing you to the initial designation as something which fleshes out the standards. If that's true, then you've got to read the initial designation in conjunction with the rule to understand whether or not it satisfies the standard of providing a reasonable guidance. Finally, in terms of... Counsel, if I may interrupt you on that point. Please. Is it your contention, then, that if the initial designation is invalid, does the rule then also fall for the similar reason, for the lack of articulable standard? No, I want to make it clear, Your Honor. We have a general argument that there are no authority to get into this business at all, and the separation of powers argument. If we lose on that, however, the way they treated us was a complete violation of due process and the APA. They gave us no notice we were in adjudication. They did retroactive rulemaking. They gave us no pre-deprivation process. So those relate to the initial designation, even if you disagree with us on the general rule. I was trying to make the point in terms of, we need to show that the rule is facially invalid. They're the ones who are telling you, you can't read the rule without looking at what we did to Huawei, because what they did to Huawei is supposedly what fleshes out the standards sufficient to provide meaningful guidance. Okay, thank you. Judge Wilson, does that answer your question, sir? There's no clarification, yes. Thank you. Okay, thank you. I believe our time has expired. Gentlemen, we appreciate your arguments today. The case is submitted.